UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

THE UNITED STATES OF AMERICA
*ex rel* DUNI BANGURA and CHRISTINE VAN BUREN,

                                                Plaintiff,

-against-

RIVER VALLEY CARE CENTER, Inc., THE NEW RIVER VALLEY COMPANY LLC, THE GRAND HEALTHCARE SYSTEM, and JEREMY STRAUSS,

                                                Defendants.

**FILED UNDER SEAL PURSUANT TO 31 USC §§ 3729** *et seq.*

**Jury Trial Demanded**

ECF CASE

-------------------------------------------------------------------- x

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### PRELIMINARY STATEMENT

1. This is a civil fraud action brought by a private person known as a *qui tam* relator, or whistleblower, on behalf of the United States of America pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 USC §§ 3729 *et. seq.*

2. On behalf of the United States of America, Plaintiff and Co-relators Duni Bangura and Christine Van Buren file this *qui tam* complaint against Defendants and alleges that Defendants defrauded the United States by submission of false claims for reimbursement based upon overdiagnosis and overtreatment of residents of River Valley Care Center nursing home for depression in order to increase the daily rate of pay to the nursing home.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 31 USC §§ 3732(a) and 3730(b) and 28 USC §§ 1331 and 1345.

4. Venue is laid within the United States District Court for the Southern District of New York in that all of the events alleged occurred within the boundaries of the Southern District of New York.

5. There have been no public disclosures of the allegations or transactions contained here that bar jurisdiction under 31 U.S.C. § 3730(e), and Relators have filed a Disclosure Statement with the United States Attorney's Office for the Southern District of New York, pursuant to 31 U.S.C. § 3730(b)(2).

## BACKGROUND

The Federal False Claims Act

6. This is a civil action to recover damages and penalties on behalf of the United States of America arising from false claims and statements made and presented by Defendants and/or their agents and employees in violation of the Federal False Claims Act ("FCA"), 31 USC §§ 3729 *et. seq.*

7. The FCA provides that any person who knowingly submits or causes to be submitted, a false or fraudulent claim to the government for payment or approval is liable for civil penalties for each such claim submitted or paid, plus up to three times the amount of damages sustained by the government as well as other relief the Court may deem appropriate.

8. Liability attaches under the FCA when a defendant submits or causes to submit a claim for payment from government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used to get a false or fraudulent claim for government funds paid or approved.

9. Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made a false record or statement to conceal, avoid or decrease an obligation to pay

2

or transmit money to the government.

10. The FCA permits any person having information regarding a false or fraudulent claim for payment from government funds to bring an action for himself as the Relator and for the government and allow him to share in any recovery. It is a requirement under the FCA that the complaint be filed under seal (without service on the defendants), to enable the government to conduct its own investigation without the defendants' knowledge and to allow the government an opportunity to intervene in the action.

11. Based on these provisions, Relators seek to recover damages and civil penalties arising from defendants' presentation of false and fraudulent records, claims, and statements and certifications made to the United States of America, in connection with defendants' practices and programs funded through the Medicare and/or Medicaid programs. Relators seek to recover all available damages, civil penalties, and all other relief available for expenditures impacted by defendants' fraud.

Medicare Program Compliance

12. In 1965 Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide heath insurance for the elderly and disabled. The Medicare Program is administered through the United States Department of Health and Human Services, and specifically the Center for Medicare and Medicaid Services ("CMS").

13. To participate in Medicare, health care providers must (1) comply with all regulatory and record-keeping requirements mandated by CMS and (2) assure that their services are provided economically and only when, and to the extent that, they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific and genuine illness or injury.

14. CMS established the Multiple Data Set ("MDS") as a federally mandated process which provides a comprehensive assessment of each nursing home resident's functional capabilities and which helps nursing home staff identify health problems and provide the foundation upon which a resident's individual care plan is formulated. MDS assessments are completed for all residents in certified nursing homes, regardless of source of payment for the individual resident, by licensed health care professionals employed by the nursing home and are transmitted electronically by nursing homes to the national MDS database at CMS.

15. The function of the MDS is clinical evaluation and guidance for the care plan, but it is also the foundation for determining each resident's Medicare payment. Payments to the nursing home are per diem rates based on the patient's condition as determined by classification into a specific Resource Utilization Group ("RUG") to streamline payment for sub-acute facilities for nursing, therapy, and room and board for patients.

16. The Resource Utilization Group ("RUG") is a classification system that groups residents according to average daily care needs, and which is based upon data elements derived from the MDS, and is meant to reflect the services required for maintenance of health of that resident. A resident's RUG level will determine the patient's daily rate of reimbursement.

17. These tiers of payment, or RUG levels, are based on level of nursing care, routine services, ancillary services, room considerations (including isolation), capital-related costs and minutes of therapy provided. The levels are determined periodically and facilities are paid these set rates prospectively throughout a patient's rehabilitation stay.

18. One of the mandatory diagnostic tools for assessment of residents is a survey of patients called the Resident Mood Interview, or PHQ. CMS requires that these surveys be answered in conformity with the Minimum Data Set 3.0 Resident Assessment Instrument User's

Manual ("RAI Manual"), which they also promulgate. The PHQ poses specific questions about the mental health of the resident and are to be answered entirely by the patient.

19. The RAI Manual specifies that the PHQ is not an interpretive questionnaire. An assessor must record the yes or no answers in response to questions about the resident's overall mood and the frequency of specific symptoms.

20. Furthermore, assessors do not make or assign a diagnosis, they simply record the presence or absence of specific clinical mood indicators on the PHQ. Facility staff should be cognizant of these indicators and consider them when developing the resident's individualized care plan.

21. After conducting the PHQ, the assessor must then total the scores and indicate the "Total Severity Score", which indicates how depressed the resident is, a higher score correlating with more depression. The Total Severity Score ranges from 1-27, with 27 being "severely depressed." Any score over ten will trigger: (1) a higher RUG level and (2) the need for a clinical intervention, such as treatment by a psychiatrist or psychologist, for which reimbursement will be partially paid to the nursing home.

22. Reimbursement rates are set out in the Medicare Part A "Prospective Payment System", which sets a RUG level in part based upon a numeric measure of the resident's ability to engage in the basic activities of living ("ADL Index" or "ADL"), such as eating, bathing, dressing, toileting and a resident's PHQ scores. A resident with a higher ADL will require greater support and services from a nursing home, and will be reimbursed at a higher rate.

23. In addition, those residents with the same ADL Index that receive a PHQ score over 10 will be entitled to reimbursed by CMS at a higher rate than a patient who is not depressed.

24. For example, a resident whose only services are room and physical assistance will be

5

assigned a RUG level of PA1 (these residents are colloquially referred to as "PAs"), and will be reimbursed at the lowest possible rate of $194.44 per day. A resident with an ADL of 2-5 will be assigned RUG level CB1 and will be entitled to a reimbursement of $275.62 a day. In contrast, a resident with an ADL of 2-5 who also has a total severity score over 10 on the PHQ, will be assigned a RUG level of CB2 that results in a higher rate of reimbursement of $297.61 a day.

25. Once the PHQ is completed for each patient, it is the responsibility of the MDS Coordinator to input all of the information into the electronic national MDS database operated by CMS for compliance tracking and billing purposes. CMS will then reimburse the nursing home accordingly.

## PARTIES

26. Relator Duni Bangura ("Bangura") is a United States citizen with a master's degree in social work who was employed for nearly 7 years as the Director of Social Service for defendants at River Valley Care Center, Inc., a nursing home. Bangura's general duties as a social worker were to make an assessment of every patient's psycho-social well-being, attend to their social and emotional needs, engage in discharge planning and crisis intervention and conduct quarterly assessment of their mood for the Minimum Data Set (MDS), as required by CMS.

27. Relator Christine Van Buren ("Van Buren") was a River Valley Minimal Data Set Coordinator for 13 years and is a licensed practical nurse, whose job it was to evaluate residents and input all required information for clinical assessment of all residents in Medicare and Medicaid certified nursing homes.

28. Defendant River Valley Care Center, Inc. ("River Valley") is a New York corporation formed in 1999, whose Chief Executive Officer is Moshe Kalter. River Valley is a 160-bed

nursing home located at 140 Main Street, Poughkeepsie, New York. The 200 employees of River Valley are paid by The New River Valley Company LLC, a New York corporation formed in 1999, whose Chief Executive Officer is Moshe Kalter.

29. Defendant The Grand Healthcare Systems held itself out to the staff of River Valley as a consultant in 2013 and the new owner of River Valley starting in October 2014. The Grand Healthcare Systems owns at least five other heath care facilities.

30. Defendant Jeremy Strauss is the Chief Executive Officer of The Grand Healthcare Systems.

31. Julie Reed ("Reed") was a River Valley Minimal Data Set Coordinator, whose job it was to evaluate residents and input all required information for clinical assessment of all residents in Medicare and Medicaid certified nursing homes.

32. Elian Richardson ("Richardson") is the Administrator at the River View Valley Care Center and was hired by the Grand Healthcare Systems.

33. Mike Forsanzo ("Forsanzo") is a representative of the Grand Healthcare Systems or its predecessor.

34. Katie Doe ("Doe") is a representative of the Grand Healthcare Systems or its predecessor.

35. Dan Muskin ("Muskin") is the Regional Administrator of The Grand Healthcare Systems.

## FACTUAL ALLEGATIONS

36. In 2013, because of financial challenges, River Valley Care Center brought in a consultant to manage its operations. The nursing home was on the verge of closing down; bills were not being paid, deliveries were not being made, and the staff's checks were bouncing.

37. A meeting was held with Mike Forsanzo and Katie Doe, (representatives of The Grand Healthcare System) Duni Bangura, Julie Reed, and Christine Van Buren. At the meeting, Forsanza directed Bangura, Reed and Van Buren to manipulate the residents' depression scores higher because, he explained, that is how the nursing home makes money. Bangura responded to Forsanzo and said, "I can't do that. If they're not depressed, they're not depressed. I am not going to change anything".

38. Forsanzo sarcastically replied "apparently, you have the happiest nursing home around; are you trying to tell us that the residents here are that happy?"

39. After the meeting, Bangura, Reed and Van Buren all agreed that they would not succumb to management pressure to commit fraud by altering the mood scores.

40. Forsanzo and Doe met several more times with the MDS Coordinators, Van Buren and Reed, separately and together. Outside of the presence of the social workers, Forsanzo told them "if you can get those depression markers up, we can get more money". He recommended that the MDS Coordinators themselves re-interview residents and then change the answers previously submitted by the social workers. Van Buren told Forsanzo and Doe, "I'm not changing them. That's a lie. The social workers' interviews are correct."

41. On at least one occasion, Van Buren met with Forsanzo alone. He demanded to see the charts of 15 residents that had been classified as PAs, who receive the lowest rate of reimbursement. He reviewed their PHQs and scoured for a way to increase their RUG level.

42. On October 1, 2014, Jeremy B. Strauss, of The Grand Healthcare System, called a meeting with many of the staff of The River Valley Care Center, to introduce themselves as the new owners of the nursing home and to discuss their policy priorities.

43. During that meeting, Forsanzo reiterated the directives from a year earlier and reminded

8

staff of the reimbursement rates. Forzano directed the social workers to get the depression markers up for residents in order for the nursing home to get paid more.

44. During that meeting, the previous administrator, Martin David, announced to the new owners that the staff was all worried about their jobs. Dan Muskin, the Regional Administrator of The Grand Healthcare Systems, responded "you will be fine if you do what you are told to do".

45. Promptly after that meeting, Martin David was fired and his replacement, Elian Richardson, was on duty at River Valley Care Center by lunchtime that day.

46. After the meeting, Bangura and the other social worker on site, Jennifer Molina, discussed the new owners' mandate to artificially inflate depression markers and agreed that they were not willing to commit government fraud for them.

47. On Friday October 31, Bangura was terminated without explanation by the new administrator. The new administrator, Elian Richardson, said Bangura had no blemishes in her performance, but that River Valley was "going in a new direction."

48. On Monday, Bangura was replaced by Patricia Mosciello, ("Mosciello"), who had been employed at the Lovely Hill Nursing Home, located in Pawling, New York (now called The Grand Pawling), owned by Jeremy B. Strauss and The Grand Healthcare System.

49. About a month after Mosciello became the Director of Social Work, Van Buren confronted Mosciello about a noticeable sudden increase in depression scores, Mosciello responded "I will do whatever I have to do to get the scores higher." Van Buren reminded Mosciello that the RAI Manual instructions do not permit for any interpretation of the resident survey, and cautioned that Mosciello must accurately report what the residents themselves say. Mosciello responded "Sometimes the patients don't know what they're talking about, but I know

they're sad." Van Buren urged Mosciello to assiduously comply with the Medicare requirements, and instead note her subjective observations elsewhere in the resident's file.

50. Van Buren discussed with Mosciello, on more than one occasion, her concerns about the continued increase in depression scores, and several times challenged her evaluations of specific residents. Van Buren had also interviewed these residents herself and did not agree with the depression scores Mosciello had assigned them. Mosciello responded to Van Buren by saying: "If we can't get the PAs out, we can at least get them for depression."

51. For the quarter following Bangura's departure, the River Valley Care Center Reports for Medicaid CMI Index Prediction for the period ending January 28, 2015, show an increase in RUG level and revenue resulting from increased diagnosis of depression. The number of residents who were assigned RUG level CA2, for ADL Index 0-1 with PHQ scores over 10, increased from 2 to 9, and the number of residents who were assigned RUG level CB2, for ADL Index 2-5, increased from 0 to 9. This likely means that 10 additional residents were newly classified as depressed for the quarter after Mosciello began evaluating them.

52. This overdiagnosis resulted in a change in RUG levels and consequent higher revenue and overtreatment with clinical interventions for false claims of depression.

53. These reports were submitted electronically to CMS for reimbursement on or around January 28, 2015.

54. Van Buren had heard that Musgrove did not want her to handle MDSs, so she asked him directly. He responded that it was true that he preferred a registered nurse for that position because they bring in higher RUG levels generally.

55. In late January 2015, Van Buren was terminated without being provided any reason but was told that River Valley was "moving in a different direction."

10

56. On or about March 2015, Julie Reed resigned because she felt that River Valley was unstable due to all the firings, and she felt that her license might be on the line for what the new owners were directing her to do.

57. Through input of these inflated and inaccurate PHQs in the MDS, residents were designated a higher RUG level and were both reimbursed at a higher per diem rate, and were subjected to needless and costly clinical interventions. Through this process, defendants submitted false claims to Medicaid.

58. False claims were submitted to the MDS Coordinator by Mosciello, who manipulated the PHQs to render a higher number on the depression scale. Mosciello was both authorized and directed by management of the Grand Healthcare System, Jeremy B. Strauss, and their agents to alter these numbers in order to bill CMS at a higher rate. Defendants, with Patricia Mosciello, agreed and conspired to submit false records and claims to CMS.

59. Defendants regularly billed for inaccurate diagnoses and unnecessary intervention at River Valley. Upon information and belief defendants continue to submit false per diem claims for reimbursement to CMS and engage in these same illegal practices at all of the five sub-acute facilities that they own and operate.

60. Through the aforementioned practices, defendants have defrauded the United States out of large sums of money.

61. The United States, unaware of the falsity of these claims, records, and statements made by the defendants, and in reliance on their accuracy, paid defendants for the fraudulent claims.

62. The United States and the general public have been damaged as a result of defendant's violations of the False Claims Act.

63. On information and belief, defendants continue to submit false claims for

reimbursement to CMS. Upon information and belief, defendants engaged in these same illegal practices at all of the sub-acute facilities that they own and operate.

## **FIRST CAUSE OF ACTION**
31 USC §3729(a)(1), (2), (3)

64. The preceding paragraphs are here incorporated by reference.

65. This is a claim for treble damages and civil penalties under the False Claims Act, 31 USC §§ 3729, *et seq.,* as amended.

66. Defendants conspired to knowingly present or caused to be presented to the United States government false or fraudulent claims for the payment or approval of medical services.

67. Defendants knowingly made, used or caused to be made or used false records or statements to cause a false or fraudulent claim to be paid or approved by the United States government.

68. The United States, unaware of the falsity of the records statements or claims made by the defendants or the conspiracy involved, paid the defendants for claims that would otherwise not have been allowed.

69. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. Defendants pay not less than $5500.00 and not more than $11,000.00 for each violation of 31 USC § 3729 plus three times the amount of damages the United States has sustained because of defendant's actions;

B.  Relators be awarded the maximum amount allowed pursuant to 31 USC § 3730(d);

C.  Relators be awarded all costs of this action, including interest and attorneys' fees and costs, pursuant to 31 USC § 3730(d);

D.  Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

E.  Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Relators, on behalf of themselves and the United States, demand a jury trial on all claims here alleged.

DATED:    Brooklyn, New York
          September 22, 2015

Very truly yours,

Stoll, Glickman & Bellina, LLP
By: Andrew B. Stoll (AS8808)
    Rita A. Sethi (RS8538)
Attorneys for Relator
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217
(718) 852-3710
astoll@stollglickman.com
rsethi@stollglickman.com